**UNITED STATES of America,
Plaintiff,**

**v.**

**Richard Lee Tuk CHONG, Defendant.**

**No. CR 98–416 ACK.**

United States District Court,
D. Hawaii.

March 22, 1999.

Michael A. Weight, Office of the Federal Public Defenders, Honolulu, HI, Marcia A. Morrissey, Santa Monica, CA, for defendant.

Larry L. Butrick, Office of U.S. Atty., Honolulu, HI, for Plaintiff.

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO DISQUALIFY

KAY, Chief Judge.

### BACKGROUND

On January 4, 1999, Defendant's attorney Michael A. Weight gave a document entitled "Defendant's Supplemental Ex Parte Application for Funds for Mitigation Investigation" ("Application") to his secretary for immediate filing. Thereafter, his secretary filed it with the Court. Unfortunately, his secretary also misunderstood Mr. Weight's directions and thought that Mr. Weight had authorized her to send a copy of the Application to Assistant United States Attorney Larry L. Butrick. The document carried the notation *UNDER SEAL,* bore a red stamp stating "SEALED BY ORDER OF THE COURT," and was accompanied by a certificate of service designating Mr. Butrick as the intended recipient.

According to a letter written by Mr. Butrick on January 7, 1999 to memorialize the events involved in the instant dispute, he "scanned" the Application while reviewing other documents received in the normal course of business.

After reviewing the document but not the attachments, I felt that it was unusual to receive such a document from your office. I then checked the certificate of service, and confirmed that I was served with the Supplemental Application by your office. Nonetheless, I became concerned that the Supplemental Application was served on me by mistake. Since the moment when I became so concerned, I have not reviewed the Supplemental Application.

Memorandum in Opposition, Feb. 11, 1999, at Exh. B–1.

On the morning of January 5, 1999, Mr. Weight received a voice mail message from Mr. Butrick with a date/time of 5:46 p.m. on January 4, 1999. Mr. Butrick stated that he had been served with a copy of the Application, asked if Mr. Weight had intended to serve him, and invited Mr. Weight to call if he had any questions.

Mr. Weight immediately called Mr. Butrick and left a voice mail message advising him that he had in fact been served in error. Mr. Weight requested that Mr. Butrick return the copy served on him as soon as possible, and requested a return call. Mr. Weight then called Rowena, Mr. Butrick's secretary, who advised him that Mr. Butrick was in a meeting. Mr. Weight informed Rowena that Mr. Butrick had been served with a document that he should not have received, identified the document by its title, and asked her to locate it and return it right away. Also on the morning of January 5, 1999, Mr. Weight hand-delivered a letter to Mr. Butrick informing him that he was mistakenly served with a copy of the Application and requesting that he return the copy he received and any copies that he had made.

At midday on January 5, 1999, a copy of the Application was received at the Federal Public Defender's Office in a brown envelope with no letter or other explanation. On Wednesday, January 6, 1999 at approximately 9:00 a.m., Mr. Weight called Mr. Butrick and spoke to him. According to Mr. Weight, Mr. Butrick stated that "he had read the Application; that he had discussed the Application with Kenneth

Sorenson, his co-counsel; and that he had copied the Application and retained a copy in his office." Motion to Dismiss, February 2, 1999, at 2. Mr. Butrick's justification for retaining a copy of the Application was "so that I could establish that the document was in fact served upon me, albeit by mistake." Memorandum in Opposition at Exh. B–1.

That same day at approximately 10:45 a.m., Assistant United States Attorney Michael Seabright and Mr. Butrick called Mr. Weight. According to Mr. Weight, Mr. Seabright stated that "only Mr. Butrick actually read the document; that Mr. Butrick had discussed the document with Mr. Sorenson and with Mr. Seabright 'in general terms;' and that the latter two prosecutors had not actually read the document." Motion to Dismiss at 3. Mr Butrick freely admits that he has spoken to various individuals in his office concerning the fact of the mistaken disclosure, but states that he has not discussed the substance of the document with anyone. *See* Opposition at Exh. B–2. Mr. Seabright offered to return the single copy of the Application to Mr. Weight if they could keep the cover page and certificate of service. Mr. Weight agreed to this request.

On January 8, 1999, Defendant filed an emergency motion for protective order. Magistrate Judge Kurren issued a protective order prohibiting the use, discussion, and dissemination of the Application or its contents. On February 2, 1999, Defendant filed this instant motion to dismiss, or in the alternative, for disqualification. The Government filed its opposition on February 11, 1999, and Defendant filed a reply on February 17, 1999. The Court held a hearing on Defendant's motion on February 18, 1999. On February 19, 1999, the Court issued an Order Directing the Government to Submit Documents for In Camera Review. The Court specifically requested the following documents:

1. All documents submitted by the Government to the defense team relating to Defendant's background, medical or psychological conditions, and/or prison conditions.

2. A list of all people who were interviewed by the Government in this case prior to the date of the inadvertent service (January 4, 1999).

On February 24, 1999, the Government provided the requested documents to the Court, along with an Ex Parte Motion to Seal Affidavit and an Ex Parte Motion to Seal Government's Witness List. The Court granted both of these ex parte motions on March 1, 1999.

## DISCUSSION

In this motion, Defendant has moved to dismiss the indictment against him or, in the alternative, to disqualify certain prosecutors who were exposed to the Application. After conducting an extensive in camera review of the documents on which the Government's knowledge is based, the Court concludes that it should DENY Defendant's motion.

## I *THE PRIVILEGED, CONFIDENTIAL NATURE OF THE APPLICATION WAS NOT WAIVED BY DEFENSE COUNSEL'S INADVERTENT SERVICE.*

█ In order to evaluate Defendant's motion to dismiss the indictment, both parties contend that the Court must first determine whether Mr. Weight's inadvertent service of the Application on Mr. Butrick waived the confidential, privileged nature of the document. However, the Court finds the issue of waiver to be only tangential to the real issue here: namely, whether there was ineffective assistance of counsel. The Court believes, and the Government concedes, that a finding of ineffective assistance of counsel would necessarily trump any purported waiver of the attorney-client and work product privileges. Because the inadvertent service was not due to defense counsel's gross negligence, *see Federal Deposit Insurance Corp. v. Marine Midland Realty Credit,* 138 F.R.D. 479, 482 (E.D.Va.1991) ("[D]isclosures may occur under circumstances of such extreme or gross negligence as to

warrant deeming the act of disclosure to be intentional."); *United States v. Zolin,* 809 F.2d 1411, 1417 (9th Cir.1987) ("The secretary's delivery of the tapes . . . was sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver."), and this is a capital case, the Court concludes that no waiver occurred here.

## II *MR. BUTRICK'S ACTIONS DO NOT CONSTITUTE PROSECUTORIAL MISCONDUCT.*

Defendant argues that Mr. Butrick committed prosecutorial misconduct by failing to comply with his ethical obligations. Defendant relies on the following rule:

A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92–368 (1992). According to Defendant,

Mr. Butrick did not comply with this mandate. He read the obviously confidential Application in its entirety. He discussed the Application with Messrs. Sorenson and Seabright. He made a copy of the Application, which he retained despite Mr. Weight's unequivocal request for the return of any copies in his January 5 hand-delivered letter. Mr Butrick did not even disclose the existence of this copy of the Application until January 6.

Motion to Dismiss at 14.

 The Court observes that "lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but

to win fairly, staying well within the rules." *United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir.1993). The Court does not believe that Mr. Butrick's actions strayed outside the bounds of ethical conduct. Despite Defendant's assertions to the contrary, the Court is not convinced that the confidential nature of the Application was clear on its face. First, the filing of a document under seal does not necessarily signify that opposing counsel should not read that document. Second, the notation "ex parte" does not necessarily signify that an opposing party cannot read a document.[1] Third, the Application was accompanied by a signed certificate of service that designated Mr. Butrick as the intended recipient. Finally, both Mr. Sorenson and Mr. Butrick have stated that they have received copies of similar applications in the past.

Even though the Court finds that the confidential nature of the Application was not clear on its face, Defendant also contends that continued reading or scanning of the Application past page two amounted to prosecutorial misconduct. *See* Motion to Dismiss at 6. The Court recognizes that this is a somewhat closer call, particularly because the first few pages of the Application discuss the necessity of confidentiality in the context of a mitigation investigation. However, for the same reasons noted above, the Court believes that Mr. Butrick did not cross the line and that it was not unreasonable for him to have read the Application under these circumstances.

Likewise, the Court believes that Mr. Butrick's actions after reading or scanning the Application did not violate his ethical obligations. Mr. Butrick left a voice mail message for Mr. Weight as soon as he suspected that the Application may have been served in error.[2] Mr. Weight has

---

1. In fact, the Government points out that Defendant has previously served the Government with ex parte documents filed under seal. *See* Opposition at Exh. D.

2. The Application was filed with the Court at 4:10 p.m. and was delivered to U.S. Attor-

ney's office sometime between 4:10 p.m. and 4:30 p.m., the close of business. Mr. Weight acknowledges that he received a voice mail message from Mr. Butrick at 5:46 p.m. informing him of the suspected mistake.

admitted that he would not have known about this inadvertent disclosure but for Mr. Butrick's call. *See* Motion to Dismiss at 1. The next day, either Mr. Butrick or someone else in his office returned the Application to Mr. Weight's office. In addition, Mr. Butrick did speak with Mr. Weight the morning of January 6, 1999, and admitted that he had retained one copy of the Application, which he agreed to return (minus the cover sheet and certificate of service). In short, the Court finds that these actions simply do not constitute prosecutorial misconduct.

## III DISMISSAL IS NOT WARRANTED UNDER THESE CIRCUMSTANCES.

Defendant cites to numerous cases to justify his request for dismissal of the indictment against him. *See, e.g., United States v. Kojayan,* 8 F.3d 1315, 1319–23 (9th Cir.1993) (reversing defendants' convictions and remanding case to trial court for determination whether to dismiss the indictment based on finding of prosecutorial misconduct that included making untrue factual assertions and refusing to produce exculpatory *Brady* material, blame-shifting, and failure to acknowledge wrongdoing); *United States v. Lin Lyn Trading, Ltd.,* 149 F.3d 1112 (10th Cir.1998) (finding that district court abused its discretion in dismissing indictment because, inter alia, it failed to require defendant to show that deliberate government seizure of confidential notepad resulted in prejudice and it failed to consider less drastic alternatives); *United States v. Horn,* 29 F.3d 754, 758 (1st Cir.1994) (noting that egregious conduct by lead prosecutor, including reviewing certain confidential documents in direct defiance of the district court's order, resulted in prejudice "but not a stain so indelible as to justify dismissing the indictment").

To say the least, dismissing an indictment is a disfavored remedy. *See United States v. Rogers,* 751 F.2d 1074, 1076 (9th Cir.1985) (reversing dismissal of indictment because of the availability of less drastic remedial measures). "Courts, however, have dismissed indictments based on constitutional grounds or on the court's inherent supervisory power." *Id.* at 1077. Although the Court recognizes that it has the power to dismiss the indictment against Defendant, the Court finds that dismissal is not appropriate in the instant case because Defendant has failed to demonstrate that Mr. Butrick engaged in prosecutorial misconduct.

## IV DEFENDANT WAS NOT PREJUDICED BY DEFENSE COUNSEL'S INADVERTENT SERVICE.

In the instant case, the Government argues that there has been no prejudice of any kind. First, the Government points out that it was previously aware of Defendant's questionable psychological impairment from psychological reports that it provided to the defense team. *See* Opposition at 13. Second, the Government asserts that it was also aware of Defendant's medical condition because of the necessity of special prison arrangements for Defendant and Mr. Weight's presentation to the Death Penalty Committee on February 2, 1999. *See id.* Third, the Government argues that the existence of a psychological/medical defense is "purely speculative" because it must be based on expert testimony and the defense team has yet to conduct such examinations or obtain such testimony. Finally, the Government emphasizes that this is merely a "premature disclosure," that Fed.R.Crim.P. 12.2 obligates the defense team to provide appropriate notice and discovery if it intends to present a mental health defense,[3] and that

---

**3.** Rule 12.2(b) provides in part:
 If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.
Fed.R.Crim.P. 12.2(b).

the Government can make no use of this information unless Defendant chooses to put on a mental health defense. *Id.* at 17.

Not surprisingly, Defendant is less sanguine about the disclosure. According to Defendant, prejudice is inescapable because the Application contained the results of defense investigations to date, further investigation that needs to be conducted, and the defense strategy as to both the guilt phase and the penalty phase.

■ The Court finds that Defendant was not prejudiced by defense counsel's inadvertent service of the Application. The Court recognizes that there is no ideal solution to this dilemma. On the one hand, the Court recognizes that this case involves the most serious consequences because the Government has declared its intention to seek the death penalty if Defendant is convicted, and that disqualification of Mr. Butrick at this stage would not significantly hamper the Government's ability to prosecute this case. On the other hand, however, the Court's in camera review of documents that were in the Government's possession prior to the inadvertent disclosure demonstrates that no prejudice has occurred or is likely to occur from defense counsel's error.

First, the Court finds that the Government was already aware of Defendant's psychological conditions, both from reports that it provided to the defense team as well as from Mr. Weight's and its own presentation to the Death Penalty Committee. In conducting its in camera review of the documents submitted to the defense by the Government, the Court has identified numerous reports discussing Defendant's psychological conditions. For instance, the Court notes a 1974 report from Dr. Robert Carr indicating that Defendant suffers from "diffuse (mild) Neurological [sic] difficulties (organic damage, frontal lobe)" and that this "organic brain damage could/is a factor in Chongs [sic] life long behavior problems," Bate Stamp 00001, as well as a neuropsychology report suggesting "impaired functioning in the frontal lobes." Bate Stamp 00008; *see also* Letter from Gerald M. Farkas, Warden, Apr. 1, 1976, no Bate Stamp (noting that Defendant's psychiatric/psychological reports conclude that Defendant has "probable minimal brain damage, frontal lobe").

In addition, defense counsel's brief to the Death Penalty Review Committee referred to Defendant's "brain damage" and severe disturbance, as well as "severe physical, psychological and sexual abuse" as non-statutory mitigating factors. Brief, Jan. 20, 1999, at 22. Although submitted after the date of the inadvertent disclosure, defense counsel made no effort to preserve any sort of confidentiality surrounding the disclosure of this information. Indeed, the Court believes that defense counsel would have been remiss if it did not raise these issues before the Death Penalty Review Committee.

Moreover, Mr. Butrick has also submitted relevant excerpts from the Government's memo to the Death Penalty Review Committee. According to the cover page, the memo was sent on December 10, 1998, well before the date of the inadvertent disclosure. In that memo, the Government discusses non-statutory mitigating factors, including psychiatric evaluations that suggests that Defendant suffers from mild neurological difficulties that affect his behavior. This memo further supports the Government's contention that it was previously aware of Defendant's psychological and medical conditions.

Second, the Court finds that the Government was already, or would have soon become, aware of Defendant's medical conditions. As discussed above, numerous psychological reports and tests revealed that Defendant may suffer from damage to the frontal lobe of his brain. As for Defendant's diabetic condition, the Court finds that the Government, if it did not already know this fact, would have become aware of it soon after because it received a letter dated January 7, 1999 from the Director of the Department of Public Safety explaining Defendant's placement in administrative segregation and referring to

his need for "diabetic chow." Furthermore, defense counsel also revealed this fact to the Death Penalty Review Committee. Finally, several reports also discuss the possibility that, inter alia, Defendant may be schizophrenic and hyperkinetic. *See* Presentence Report to Judge Thomas Ogata, Cr. No. 44224, Bate Stamp 00032.

Third, the Court finds that the Government was also aware of Defendant's social/family history. For instance, the Government knew that Defendant's father was "repeatedly alcoholic," Report for Judge Doi, May 24, 1968, Bate Stamp 01200, that his father was described as "immature, a shifter, irresponsible, a heavy drinker and a poor provider," Presentence Report to Judge Thomas Ogata, Cr. No. 44224, Bate Stamp 00031, and that he "was reared in an environment of lax standards and little or no supervision," *id.* at 00032. The Government also knew that Defendant was placed in foster homes from the age of eight, and raised in an institutional setting from the age of ten, and that he experienced numerous behavioral problems. *See id.*

Fourth, the Court recognizes that Federal Rules of Criminal Procedure 12.2 and 16(b) impose discovery requirements on capital defendants with respect to the presentation of mental health defenses at the guilt phase of trial. Rule 12.2(b) provides in part:

> If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

Fed.R.Crim.P. 12.2(b). Similarly, Rule 16(b)(1)(C) requires a defendant who has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition to "disclose to the government a written summary of testimony that the defendant intends to use ... at trial ..." that "shall describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications." Fed.R.Crim.P. 16(b)(1)(C).

Although the rules discussed above do not explicitly govern the penalty phase of trial, several other courts have addressed this question and determined that the Government must have advance notice, access to the reports prepared by a defendant's mental health experts in order to rebut the accuracy of the conclusions reached therein, and an opportunity to examine the defendant prior to trial. *See United States v. Beckford,* 962 F.Supp. 748, 760 (E.D.Va. 1997); *United States v. Vest,* 905 F.Supp. 651, 652 (W.D.Mo.1995).[4]

In the instant case, the information contained in the Application does not include expert medical opinions regarding Defendant's mental health condition. Rather, it discusses the investigative steps necessary to pursue a potential mental health defense in the instant case. To the extent that there are any conclusions in the Application, the Court believes that this is the type of discoverable information that is contemplated by Rule 16(b)(1)(C).

Moreover, the Court does not believe that the Government has gained even the limited advantage of knowing that Defendant is not currently pursuing other alternative defense strategies. The contents of the Application merely reveal the defense team's focus at this point in time, with the trial scheduled to commence almost one year from now. Consequently, the Government cannot rest secure in the knowl-

4. However, courts have disagreed as to the necessity of sealing the results of the expert's examination until after the guilt phase of trial. *Compare Beckford,* 962 F.Supp. at 760 (sealing experts' reports until penalty phase); *Vest,* 905 F.Supp. at 654 (same) *with United States v. Hall,* 152 F.3d 381, 399 (5th Cir.1998) (finding it unnecessary to seal experts' reports prior to penalty phase).

edge that Defendant has limited himself to this one avenue of defense.

After conducting its in camera review, the Court concludes that no prejudice occurred from the inadvertent disclosure. This conclusion is buttressed by the fact that Mr. Butrick has submitted a witness list of those witnesses already interviewed prior to January 4, 1999, as well as a sworn affidavit in which he explicitly states that his only recollection of the contents of the Application was limited to the following:

1. That on January 4, 1999, [he] scanned defendant Chong's Supplemental Ex Parte Application for funds mitigation investigation while sorting his mail.
2. That approximately mid-way through the Ex Parte Application, [he] slowed down and read a portion of the document which indicated that defendant suffered from an unknown mental impairment which was aggravated by diabetes and defendant sought funds for an expert witness evaluation.

Affidavit of Larry L. Butrick, Ex Parte Motion to Seal Affidavit, Mar. 1, 1999. Based on its in camera review of the documents that the Government had in its possession at the time of the inadvertent disclosure, as well as Mr. Butrick's sworn affidavit, the Court concludes that no prejudice resulted. Furthermore, the Court finds that it is not necessary to appoint a special master pursuant to Local Rule 53.3 to investigate this matter any further.

## V DISQUALIFICATION IS NOT REQUIRED UNDER THE CIRCUMSTANCES.

Because there has been no prejudice and no prosecutorial misconduct, the Court finds that disqualification is not justified. *See United States v. Skeddle*, 989 F.Supp. 890, 899 n. 8 (N.D.Ohio 1997) (holding that disqualification is not warranted because defendant had not demonstrated actual prejudice that could not be avoided or remedied by less drastic means). The Court's conclusion is buttressed by two cases that address the issue of disqualifying a prosecutor in the absence of prosecutorial misconduct or a conflict of interest arising from prior representation. In *United States v. Kouri–Perez et al.*, 992 F.Supp. 511, 512 (D.P.R.1997), the court refused to dismiss a prosecutor whose assistant has been told by defense counsel's assistant that one co-defendant had arranged for some payment of other defendants' legal expenses. Because the only transgression that occurred was the sharing of privileged defense information to a known member of the opposing team, the court stated that it could not "envision, even on the horizon of most remote remedies, the disqualification" of the prosecutor. *Id.*

Similarly, in *United States v. Skeddle*, 989 F.Supp. 890 (N.D.Ohio1997), the court concluded that disqualification was not appropriate where government attorneys had access to confidential communications relating to the indictment of all the defendants. The court distinguished *United States v. Under Seal*, 757 F.2d 600 (4th Cir.1985) by finding that the "government has not gained insight via the documents into the relationship between the defendants and the attorneys defending them in this prosecution." *Skeddle*, 989 F.Supp. at 899. The court concluded that the appropriate remedy would be to exclude those documents at trial. *See id.*

The Court believes that *Kouri–Perez* and *Skeddle* are instructive. As in *Kouri–Perez*, Mr. Butrick did not engage in any misconduct that could justify his disqualification. Similarly, as in *Skeddle*, Mr. Butrick did not gain any substantial insight into the relationship between Defendant, his attorneys, and their defense strategies so there could be no prejudice.

In contrast, the Court notes that the cases cited by Defendant in support of its argument for disqualification have depended in large part on the bad faith and improper behavior of an attorney, *see United States v. Horn*, 29 F.3d 754, 758—59 (1st Cir.1994) (upholding disqualification of lead prosecutor who violated dis-

trict court's order), or on the fact that the dismissed attorney had a conflict of interest because he represented the opposing party in a prior proceeding, *see Merle Norman Cosmetics, Inc. v. United States District Court*, 856 F.2d 98, 101 (9th Cir. 1988) (upholding denial of motion to disqualify attorney because no substantial relationship existed); *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980) (reversing district court's denial of motion to dismiss attorney because his former representation was substantially related to the present case).

The only case that apparently did not rely on prosecutorial misconduct or a prior relationship with the defendant is *United States v. Under Seal*, 757 F.2d 600, 602 (4th Cir.1985). In that case, the Fourth Circuit reluctantly vacated as moot the trial court's order disqualifying a prosecutor who had read unredacted material.[5] The district court had originally concluded that disqualification was necessary because the prosecutor had read confidential documents protected by the attorney-client privilege:

> From the foregoing the court concludes that the remedy suggested by the United States, namely, no further use by the government of the privileged documents and their return to counsel for the [appellees], will not adequately maintain the integrity of the confidential attorney-client privilege, and cannot insure that those who have viewed the documents will not, even subconsciously, be affected by knowledge gained thereby in pursuing the investigation of the [appellees]. The court further concludes that the only adequate appropriate remedy is

disqualification of the Assistant United States Attorney and two agents from further participation in the investigation. *Id.* at 602. However, because the grand jury returned an indictment in the interim, the Fourth Circuit felt constrained to vacate the order. The Court believes that *Under Seal* is readily distinguishable because implicit in the court's analysis is a finding of prejudice to the defendant. Conversely, in the instant case the Court has reviewed the Government's documents in camera and concluded that there is no possibility of prejudice.[6]

## VI THE COURT WILL NOT COMPEL DEFENDANT TO WAIVE ANY CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL.

In its brief, the Government also urges the Court to require Defendant to waive his Sixth Amendment right to effective assistance of counsel on the issue of the Application's inadvertent disclosure or compel him to seek new counsel. *See* Opposition at 17. The Government refers to *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975), in which the Fifth Circuit found that a defendant could waive his Sixth Amendment right to effective assistance of counsel if such a waiver was established by "clear, unequivocal, and unambiguous language." 517 F.2d at 278.

 The Court finds that such a request is not justified for several reasons. First and most importantly, any claim of ineffective assistance of counsel based on the inadvertent service of the Application would be purely retrospective, whereas the waiver requested in *Garcia* was for a prospective, continuing conflict of interest.

---

5. In *Under Seal*, the prosecutor had been notified by the clerk of the district court that she could take possession of the nonprivileged and redacted documents. After inquiring and being told that the judge had done what was required, but without waiting for the court to order the documents unsealed, the prosecutor obtained and read documents that were not actually redacted. *See* 757 F.2d at 601.

6. At this time the Court has not found been able to find any prejudice to Defendant from

the inadvertent service of the Application. However, the Court recognizes that it is possible that prejudice may become apparent with the benefit of hindsight as the case progresses. If that situation arises, the Court will reconsider Defendant's present motion. The Court cautions that the cleanest and most assured resolution would be for Mr. Butrick to voluntarily recuse himself, although the Court finds absolutely no basis for compelling such withdrawal.

**1162**

Although Defendant may *choose* to waive any claim for ineffective assistance of counsel, if any, that he might have, the Court cannot *compel* him to waive his claim. The Supreme Court has unequivocally found that waiver must be knowing, intelligent, and voluntary. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The notion of compelled waiver is antithetical to this doctrine.

In addition, the Court finds that such an order is not justified under the circumstances. As discussed above, the Court finds that Defendant has suffered no prejudice by defense counsel's inadvertent service. Moreover, the Court recognizes that any claim for ineffective assistance of counsel arising from the inadvertent service is retrospective. Even if the Court were to compel Defendant to retain new counsel, this would not remedy any retrospective constitutional violation.

### VII *MAGISTRATE JUDGE KURREN'S PROTECTIVE ORDER WILL CONTINUE IN EFFECT.*

The Court reiterates that Magistrate Judge Kurren's protective order will continue in effect. Therefore, all employees of the United States Attorney for the District of Hawaii, the Department of Justice, or the Federal Bureau of Investigation are prohibited from using, disclosing, disseminating, and communicating to others, or among themselves, the contents of the January 4, 1999 document entitled "Defendant's Supplemental *Ex Parte* Application for Funds for Mitigation Investigation" until further order of the Court.

### *CONCLUSION*

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss the indictment or, in the alternative, to disqualify the prosecutor.

IT IS SO ORDERED.