**UNITED STATES of America,**

**v.**

**Martha STEWART and Peter Bacanovic, Defendants.**

**No. 03 Cr.717(MGC).**

United States District Court, S.D. New York.

Oct. 20, 2003.

Rebecca A. Monck, John J. Tigue, Jr., Robert G. Morvillo, Morvillo, Abramowitz, Grand, Iason & Silberberg, PC, New York City, for Martha Stewart.

Richard M. Strassberg, Goodwin Procter, LLA, New York City, David J. Apfel, Goodwin Procter, Boston, MA, for Peter Bacanovic.

Michael S. Schachter, Assistant U.S. Attorney, James Comey, U.S. Attorney, New York City, for United States.

*OPINION*

CEDARBAUM, District Judge.

By letter dated August 21, 2003, the Government requested an early determination of whether an e-mail that Martha Stewart sent to her attorney and then forwarded to her daughter is either attorney-client privileged or protected as attorney work product. After considering the submissions of various parties, I hold that the e-mail is protected work product, and that for the reasons stated below, Stewart did not waive its immunity by forwarding the document to her daughter.

### Background

The following facts are drawn from the Indictment, a series of letters and affidavits offered by the Government and the defendant, and a letter from counsel to Martha Stewart Living Omnimedia ("MSLO").

On December 27, 2001, Stewart sold 3,928 shares of stock in ImClone Systems, Inc. ("ImClone"), a company that develops biologic medicines. The following day, ImClone announced that the Food and Drug Administration had rejected the company's application for approval of Erbitux, a cancer-fighting drug that ImClone had previously described as its lead product. ImClone stock is traded on the NASDAQ National Market System, an electronic market system administered by the National Association of Securities Dealers, Inc. After the announcement, the price of ImClone stock declined.

The Indictment alleges that Stewart sold her ImClone stock after learning that Samuel Waksal, Chief Executive Officer of ImClone, was seeking to sell his shares. Waksal was a friend of Stewart's and a client of Stewart's stockbroker at Merrill Lynch, defendant Peter Bacanovic.

In early 2002, various government agencies, including the Securities and Exchange Commission ("SEC"), the FBI, the United States Attorney's Office for the Southern District of New York ("USAO"), and a congressional subcommittee, initiated investigations into Stewart's December 27 sale of stock. In June, 2002, the media acquired information about the investigations and began reporting details of the sale. In response, Stewart made several public statements denying any wrongdoing and setting forth her recollection of the facts surrounding the stock trade.

On June 23, 2002, Stewart composed an e-mail that contained her account of the facts relating to her sale of ImClone stock. She sent this e-mail to Andrew J. Nussbaum, an attorney at Wachtell, Lipton, Rosen & Katz, who was at that time one of the lawyers representing Stewart in her dealings with the government. The following day, Stewart accessed the e-mail from her own e-mail account and, without making any alterations to it, forwarded a copy to her daughter, Alexis Stewart.[1]

On August 12, 2002, a grand jury that had been convened to investigate Stewart's sale of ImClone stock issued a subpoena to MSLO, seeking documents relating to the sale and "[a]ll desktop and laptop computers used by Martha Stewart" and several other MSLO employees. *See* Grand Jury Subpoena dated August 12, 2002. Subsequent subpoenas sought specific electronic files located on MSLO's servers. Wishing to comply with the subpoena but unwilling to give the grand jury unrestricted access to its computer files, MSLO eventually reached a compromise with the Government: the company agreed to provide the requested computers and files to the grand jury, and the Government agreed that it would not review the files until MSLO identified which documents were responsive to the subpoena. MSLO also agreed to provide a log of responsive documents that were being withheld on the basis of privilege, and the Government agreed that it would not review any produced files that were not specifically listed on the log of responsive documents without first consulting MSLO.

MSLO produced the documents and later submitted two logs of responsive documents. Because MSLO determined that the e-mails sent on June 23 and June 24 were privileged, neither appeared on these logs. After review and consultation with Stewart's attorneys, MSLO produced two logs of privileged documents. The first log reflects documents that the company produced in hard copy form, the second reflects computer files. The June 23 and 24 e-mails appear on the log of hard copy documents as one entry. The log indicates that the e-mail was sent to Nussbaum and to Stewart's daughter, and that it was being withheld based on Stewart's assertion of attorney-client privilege. While the June 23 e-mail to Nussbaum appears on the log of privileged computer files, MSLO inadvertently omitted the June 24 e-mail to Alexis Stewart.

The grand jury returned an indictment on June 4, 2003, charging Stewart with conspiracy, obstruction of justice, making

---

1. The Government premises its arguments regarding attorney-client privilege and work product protection on the notion that the June 23 and June 24 e-mails are two separate communications and that Stewart must assert claims of protection and of non-waiver as to each. Stewart responds that the June 24 e-mail was only a copy of the June 23 e-mail.

An examination of the June 24 e-mail, appended in redacted form to the Government's August 21 letter as Exhibit A, shows that the body of that document incorporates the heading of the June 23 e-mail. It is clear, therefore, that the e-mail sent to Alexis Stewart was a forwarded copy of the original.

false statements, and securities fraud. Shortly thereafter, in preparation for trial, an Assistant United States Attorney ("AUSA") who was unaware of the agreement between MSLO and the Government began reviewing the documents that MSLO had produced, which had apparently never been reviewed in the course of the grand jury investigation. During this review, the AUSA discovered the June 24 e-mail from Stewart to her daughter. After learning of the agreement concerning document review, the AUSA stopped reviewing the MSLO documents.

In July, 2003, the Government asked MSLO whether it would continue to assert privilege over the e-mail to Nussbaum noted on the privilege log. MSLO replied that Stewart's personal attorneys required additional time to review the document, and in August, Stewart informed the Government that she was objecting to MSLO's production of the document. Stewart maintained that the e-mail to Nussbaum was protected by attorney-client privilege and the work product doctrine, neither of which Stewart waived by forwarding the e-mail to Alexis Stewart. The Government then sought a judicial determination of the status of the June 24 e-mail.

### Discussion

Stewart offers four objections to production of the e-mail. First, she argues that the forwarded e-mail did not waive her attorney-client privilege because she did not intend to waive the privilege and because communications between a parent and her adult child should not constitute waiver. Second, she argues that because the grand jury subpoena to which the e-mails were responsive is no longer in force, the Government is not entitled to the documents. Third, she contends that the Government should not benefit from its violation of the document production agreement between MSLO and the USAO,

and therefore should not be allowed to use the e-mail at trial. Finally, she argues that the forwarded e-mail is attorney work product, and that she did not waive work product protection by forwarding the document to her daughter.

### A. Stewart's Attorney–Client Privilege and Grand Jury Arguments

■ Stewart's June 23 e-mail to Nussbaum was clearly protected by her attorney-client privilege, *see In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir.1984) (noting that "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived"), until she waived that privilege by forwarding a copy of the e-mail to her daughter, *see In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973) ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege"). Defendant's arguments regarding Stewart's intent and the sanctity of the family notwithstanding, the law in this Circuit is clear: apart from a few recognized exceptions, disclosure to third parties of attorney-client privileged materials results in a waiver of that privilege. No exception is applicable in this case.

■ Stewart next argues that the Government may not use the June 24 e-mail because the grand jury subpoena to which it was responsive is no longer in force. Stewart cites no authority supporting the

proposition that the Government may not use documents gathered as a result of a valid grand jury subpoena if the grand jury did not use them. Stewart also offers no persuasive justification for the creation of such a rule.

■ Similarly, Stewart cites no authority for the proposition that the Government should be barred from using documents that it reviewed in inadvertent violation of an informal document review agreement.

## B. Work Product Protection

It should be noted at the outset that the application of the work product doctrine to grand jury matters is not entirely straightforward. The doctrine, which the Supreme Court first articulated in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), protects against "invading the privacy of an attorney's course of preparation," *id.* at 512, 67 S.Ct. 385, recognizing that "[i]n performing his various duties ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," *id.* at 510, 67 S.Ct. 385. The Court recognized that such protection is necessary for the adversary system to function smoothly: "Were [work product] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own.... [T]he interests of the clients and the cause of justice would be poorly served." *Id.* at 511, 67 S.Ct. 385.

*Hickman* was a civil case, but the Court has held that the work product doctrine applies in criminal matters as well, *see United States v. Nobles*, 422 U.S. 225, 237–38, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); indeed, the Court noted:

> Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.

*Id.* at 238, 95 S.Ct. 2160. In this Circuit, recognition of the increased importance of work product protection in criminal cases has fueled the doctrine's extension to grand jury matters, even though neither the civil nor the criminal work product rule applies by its terms to grand juries. *See In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir.2003); *see also* Fed. R.Civ.P. 26(b)(3); Fed.R.Crim.P. 16(b)(2). Because the civil and criminal rules contain significant differences, however, it is unclear whether the grand jury context implicates the policies underlying one rule more than the other, or whether different work product policies should be applied.

In civil litigation, the work product doctrine has experienced tremendous growth through amendments to the Federal Rules of Civil Procedure and through decisional law, and now extends its protection far beyond *Hickman's* concern for "the files and the mental impressions of an attorney." *Hickman*, 329 U.S. at 509, 67 S.Ct. 385; *see, e.g., Nobles*, 422 U.S. at 238–39, 95 S.Ct. 2160 (noting that because of the realities of the adversary system, "[i]t is ... necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself"); *United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir.1998) (stating that to acquire work product protection, a document need not be prepared to assist in litigation, as long as it is prepared in antic-

ipation of litigation); *Golden Trade, S.r.L. v. Jordache,* 143 F.R.D. 508, 511 (S.D.N.Y. 1992) (observing that under Fed.R.Civ.P. 26(b), work product-protected material need not actually reflect an attorney's mental processes). It is not obvious, however, that the doctrine should be presumed to have undergone parallel development in criminal and grand jury procedure, although courts, perhaps from a dearth of criminal authority, freely draw from civil cases, and sometimes civil rules, when deciding issues of work product protection in the criminal context. *See, e.g., In re Grand Jury Subpoena Dated October 22, 2001,* 282 F.3d 156, 161 (2d Cir.2002) (citing Fed.R.Civ.P. 26(b)); *United States v. Gangi,* 1 F.Supp.2d 256, 261 (S.D.N.Y. 1998) (citing Fed.R.Civ.P. 26(b) and civil case law).

Even with such questions set aside, this case presents an unusual set of facts: the defendant forwarded a purportedly work product-protected document to a nonlawyer family member whose interest in the case can only be described as personal. In nearly every reported case involving waiver of work product protection based on disclosure, the individual to whom the disclosure was made had some litigation-based interest in the matter disclosed, whether as adversary, potential adversary, ally, or assistant. *See, e.g., In re Steinhardt Partners, L.P.,* 9 F.3d 230, 235 (2d Cir.1993) (holding that the defendant waived work product protection in a civil suit through previous disclosure of a legal memorandum to the SEC); *United States v. Am. Tel. & Tel. Co.,* 642 F.2d 1285, 1299–1300 (D.C.Cir.1980) (no waiver where the transferor of information and the transferee were proceeding against a common adversary).

■ The first question, of course, is whether Stewart has met her burden of demonstrating that the e-mail is protecti-

ble work product. As noted above, the work product doctrine (which appears, for the most part, to have lost the adjective "attorney") now protects a great deal more material than *Hickman* contemplated. As a purely factual statement of Stewart's recollection of events, the e-mail does not implicate *Hickman's* primary concern: the exposure to an adversary of an attorney's thoughts in preparation for trial. *See Nobles,* 422 U.S. at 239, 95 S.Ct. 2160 ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."). The e-mail, which I have reviewed *in camera,* cannot reasonably be construed as revealing Stewart's attorneys' legal strategies or thought processes. Yet if Fed.R.Civ.P. 26(b) applied, the document would be protected: Rule 26(b)(3) states that parties may discover relevant, otherwise non-privileged

> documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials . . . and . . . is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed.R.Civ.P. 26(b)(3). The Second Circuit has stated that a document acquires work product protection if it "was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation." *Adlman,* 134 F.3d at 1195. Stewart's e-mail fits comfortably within Rule 26(b)'s definition: it is a document prepared "by . . . a party," and because Rule 26 offers immunity to a broader range of documents than *Hickman* pro-

tected, the e-mail's purely factual content is no bar to protection.

Federal Rule of Criminal Procedure 16(b), which governs pre-trial discovery in criminal cases, is even more protective than the civil rule, authorizing only the disclosure of a defendant's "scientific or medical reports," Fed.R.Cr.P. 16(b)(2), and then only if the defendant first requests disclosures from the Government. Although neither rule applies here, the Supreme Court's assertion in *Nobles* that work product protections are "even more vital" in criminal matters suggests that protection in the grand jury context should be, at the very least, no weaker than in the others.

While concerns specific to grand jury proceedings—namely, that "[n]owhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena," *In re Grand Jury Proceedings*, 219 F.3d 175, 186 (2d Cir. 2000) (quoting *In re Sealed Case*, 676 F.2d 793, 806 (D.C.Cir.1982))—might argue against such robust work product protection for subpoenaed documents, several Second Circuit decisions involving grand jury subpoenas have held that factual statements similar to the e-mail at issue constitute work product. In *In re John Doe Corp.*, 675 F.2d 482 (2d Cir.1982), for example, the Second Circuit held that attorney notes paraphrasing witnesses' factual statements were work product, *see id.* at 492–93. At the same time, however, the

court compelled disclosure of the notes, determining that the Government had made a sufficient showing of need and hardship and that production "would not trench upon any substantial interest protected by the work-product immunity." *See id.* at 493. Similarly, *In re Six Grand Jury Witnesses*, 979 F.2d 939 (2d Cir. 1992), involved a subpoena seeking testimony regarding facts discovered in an internal investigation. In that case, the court held that "relevant, non-privileged facts may be discovered from an attorney's files *where their production is essential to the opponent's preparation of its case,"* id. at 944 (emphasis added). Although the protection was overcome in both instances by a showing of need, the court nevertheless concluded that the material was work product.[2] As the Second Circuit noted elsewhere: "While it may well be that work product is more deeply concerned with the revelation of an attorney's opinions and strategies ... we see no reason why work product cannot encompass facts as well." *In re Grand Jury Subpoena*, 282 F.3d at 161 (citation omitted).

The Government contends that Stewart has not met her burden of proving that the document was prepared in anticipation of litigation and that it would not have been prepared in substantially similar form but for the prospect of litigation. *See Adlman*, 134 F.3d at 1195. The affidavits submitted by the defendant, which I must

---

**2.** *But see In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F.Supp.2d 270, 284 (S.D.N.Y.2001) (observing that "the collection of evidence, without any creative or analytic input by an attorney or his agent, does not qualify as work product") (quoting *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 559 (S.D.N.Y.1994)); *see also S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2003 WL 193071 (S.D.N.Y. Jan. 29, 2003) (holding that "it is the thought processes of the attorney that are entitled to protec-tion; underlying facts are always discoverable. Thus, if a document ... merely sets forth facts that were reported to the attorney, and there is no realistic way that their disclosure would create 'a real, nonspeculative danger of revealing the lawyer's thoughts,' that document is not protected as work product." (citations omitted)). Neither of these cases, however, dealt with an individual facing multiple civil and criminal investigations who was compiling facts on her own behalf.

accept as true, indicate that while Stewart's lawyers do not appear to have requested this specific e-mail, she prepared it in response to her attorneys' ongoing requests for factual information in the furtherance of their legal representation. *See* Martha Stewart Aff. ¶¶ 3–4 ("From on or about January 25, 2002, through June, 2002, I frequently communicated with Messrs. Nussbaum and Savarese to provide them with what I recalled of the facts relating to the USAO investigation. We met and conferred from time to time. They provided me with information they had gleaned from third parties, and as a result of these activities they provided me with legal advice.... Messrs. Nussbaum and Savarese continually solicited factual information from me. Sending the email was part of that ongoing process."); Savarese Aff. ¶ 8 ("During the period from late January 2002 through June 2002, Mr. Nussbaum and I frequently spoke with Ms. Stewart. We continually solicited factual information from her. We continually provided legal advice to her."); Nussbaum Aff. ¶ 10 ("I understood that Ms. Stewart had generated the e-mail in question to obtain legal advice. Mr. Savarese and I had requested from time to time that Ms. Stewart provide us with any facts relevant to the investigations. I took the e-mail as an attempt by Ms. Stewart to memorialize her recollection of the facts so that we would be better equipped to represent her and provide her with legal advice."). As for the Government's contention that the e-mail should not be protected because it would have taken the same form if created for a nonlitigation purpose, it is difficult to see how anyone could draft a recollection of facts in a way that would make it distinctly litigious. That particular requirement has less force here than in *Adlman,* which dealt with opinion work product.

Therefore, although the e-mail to Stewart's daughter does not realistically risk revealing the thought processes of Stewart's attorneys, I conclude that it is protectible as preparation for litigation. The Government does not claim that it has substantial need for the statements in the e-mail. I must therefore determine whether Stewart waived the protection by forwarding the e-mail to her daughter.

 Most courts that have analyzed the question whether a party has waived work product protection over documents by disclosing them to third parties have found waiver only when the disclosure "substantially increased the opportunities for potential adversaries to obtain the information." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2024 (1994); *In re Copper Market Antitrust Litig.,* 200 F.R.D. 213, 221 n. 6 (S.D.N.Y.2001); *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982). Thus, courts have found parties to have waived protection of the doctrine by voluntarily submitting documents to potential adversaries, such as government agencies. *See, e.g., Steinhardt Partners,* 9 F.3d at 235. Courts have also decided that by disclosing work product to an adversary in one case, parties may waive protection in future cases against different adversaries. *See, e.g., Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 480 (S.D.N.Y.1993). However, the sharing of litigation materials among nonadversarial parties, such as co-plaintiffs, or among parties opposing the same adversary in different proceedings, has been held not to constitute waiver. *See, e.g., Am. Tel. & Tel.,* 642 F.2d at 1299.

This approach recognizes that the purpose of the work product doctrine "is to protect material from an opposing party in litigation, not necessarily from the rest of

the world generally." *Id.* at 1298–99. The doctrine's concerns are not implicated by a disclosure that does not increase the risk of adversarial intrusion into an attorney's "zone of privacy"; thus, such disclosures should not be viewed as waiving the protection. *See Copper Market,* 200 F.R.D. at 221 n. 6 ("Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine."). Phrased in terms of the intent driving the disclosure, because the doctrine protects only against disclosure to adversaries, "[d]isclosure to third persons in no way indicates a party's intent to allow his adversary access to work product materials; waiver is therefore not warranted." Jeff A. Anderson et al., "The Work Product Doctrine," 68 *Cornell L.Rev.* 760, 884 (1983).[3]

Other cases suggest that fairness should play a role in determinations of waiver by disclosure. In *Granite Partners, L.P. v. Bear, Stearns & Co.,* 184 F.R.D. 49 (S.D.N.Y.1999), Judge Sweet held that a broker-dealer that had published and disseminated a report selectively quoting from internal investigation documents had waived work product protection over those documents, noting that "[t]he work product privilege is waived when a party to a lawsuit uses it in an unfair way that is inconsistent with the principles underlying the doctrine of privilege," *id.* at 54. *See*

*also Tribune Co. v. Purcigliotti,* No. 93 Civ. 7222, 1997 WL 10924, at *5 (S.D.N.Y. Jan 10, 1997) ("[W]here there is a partial disclosure in the context of the litigation for the benefit of the privilege holder, there may be a complete subject matter waiver as to all communications on the subject. In contrast, where the disclosure is extrajudicial or non-prejudicial to an adversary, there may be no waiver or only a narrow one.").

By forwarding the e-mail to a family member, Stewart did not substantially increase the risk that the Government would gain access to materials prepared in anticipation of litigation. Martha Stewart stated in her affidavit that "Alexis is the closest person in the world to me. She is a valued confidante and counselor to me. In sharing the e-mail with her, I knew that she would keep its content strictly confidential." Martha Stewart Aff. ¶ 6. Alexis Stewart stated that while she did not recall receiving the June 24 e-mail, she "never would have disclosed its contents." Alexis Stewart Aff. ¶ 2. The disclosure affected neither side's interests in this litigation: it did not evince an intent on Stewart's part to relinquish work product immunity for the document, and it did not prejudice the Government by offering Stewart some litigation-based advantage. Accordingly, I hold that Stewart did not waive work product protection over the June 23 and 24 e-mails.

---

3. Some decisions qualify this test for work product waiver by examining whether the disclosure served a litigation purpose. In deciding that a party waived work product protection for litigation committee materials by disclosing them to an independent auditor, Judge Hellerstein noted that "where the third party to whom the disclosure is made is not allied in interest with the disclosing party or does not have litigation objectives in common, the protection of the doctrine will be waived." *Medinol, Ltd. v. Boston Scientific Corp.,* 214 F.R.D. 113, 115 (S.D.N.Y.2002).

*See also Am. Tel. & Tel.,* 642 F.2d at 1299; *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1429 (3d Cir. 1991). In *Medinol,* Judge Hellerstein noted that the auditor's interests were "not necessarily united with those of [the defendant]; they were independent of them." *Medinol,* 214 F.R.D. at 116. Again, the unusual facts of this case defy easy categorization: while Alexis Stewart has no "litigation interest" in common with the defendant, neither can she be said to be "independent" in her interests in the case.

The Government argues that even if the e-mails are protected as work product, Stewart waived that privilege through MSLO's defective entries on the privilege logs. However, the case upon which the Government relies, *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y.1990), followed local Civil Rule 26.2 in holding that failure to identify the type of privilege being asserted results in waiver of the privilege. Not only is this case not governed by civil rules, the current version of Rule 26.2 makes no reference to waiver. Since both sides in this matter have made errors in the process of producing and reviewing documents, the problems of MSLO's privilege logs do not merit a finding that Stewart waived any privilege.

### Conclusion

For the foregoing reasons, Stewart's June 23 and 24 e-mails are work product protected from production in response to the grand jury subpoena.

SO ORDERED.