**UNITED STATES OF AMERICA,**

v.

**Martha STEWART and Peter Bacanovic, Defendants.**

**No. 03 CR.717 MGC.**

United States District Court,
S.D. New York.

Dec. 8, 2003.

Michael S. Schachter, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for Plaintiff.

John J. Tigue, Jr., Rebecca A. Monck, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., Robert G. Morvillo, Morvillo, Abramowitz & Grand, P.C., New York City, for Defendants.

## MEMORANDUM OPINION

CEDARBAUM, District Judge.

In a previous opinion, I held that an e-mail that defendant Martha Stewart sent to her lawyer and then forwarded to her daughter was protected work product and unavailable for the Government's use at trial. *See United States v. Stewart*, 287 F.Supp.2d 461 (S.D.N.Y.2003). Stewart now seeks an order disqualifying the Assistant United States Attorney ("AUSA") who inadvertently read the e-mail from cross-examining Stewart or participating in preparation for such cross-examination, should Stewart choose to testify. For the reasons that follow, defendant's application is denied.

### Background

During the grand jury investigation into Stewart's sale of ImClone securities, a subpoena seeking computer files and documents relating to the sale was served on Martha Stewart Living Omnimedia ("MSLO"). MSLO and AUSA Michael Schachter reached an informal agreement that expedited production of the documents while preserving Stewart's ability to assert privilege over them. MSLO agreed to turn over all materials specified in the subpoena, as well as logs indicating which documents were responsive to the requests and which were privileged. Schachter agreed that the Government would not review any files beyond those specifically listed on the log of responsive files. After the grand jury returned an indictment, AUSA Karen Patton Seymour began reviewing the MSLO documents in preparation for trial. She was unaware of the existence of the logs and of the agreement. In late June 2003, Seymour discovered an e-mail from Stewart to her daughter, dated June 24, 2002, that contained Stewart's account of the facts surrounding her sale of ImClone stock. The body of the e-mail indicated that it was a forwarded copy of

an e-mail Stewart had sent to one of her lawyers on June 23. For this reason, Seymour became concerned about potential privilege problems. Investigating the matter further, she learned of the Government's agreement with MSLO. Seymour immediately stopped reviewing the documents. She then consulted the two privilege logs that MSLO had produced and ascertained that the e-mail appeared on neither, although one of the logs listed the June 23 e-mail to Stewart's lawyer and the other log listed a June 23 e-mail with Stewart's lawyer and daughter as joint recipients. In early July 2003, the Government initiated discussions with MSLO and Stewart regarding defendant's assertion of privilege over the e-mail and several other documents. In late August 2003, after Stewart stated that she would continue to assert privilege over the document, the Government alerted the court and defendants that Seymour had read the e-mail. Seymour affirmed that she did not reveal the contents of the e-mail to anyone else and took steps to make certain that other members of the prosecution team would not have access to the e-mail.

### Discussion

■ Stewart argues that if she chooses to testify, she will be vulnerable to Seymour's knowledge of Stewart's recollection of events as recounted in the e-mail. According to Stewart, Seymour cannot be expected to segregate in her mind the information she gleaned from the e-mail, and disqualifying Seymour from participating in Stewart's cross-examination is the only remedy that will ensure that her knowledge will not "taint the proceedings." Stewart offers as an analogy the rule that a lawyer who has represented one client will be disqualified from representing another whose interests are adverse to the former client in a substantially related matter. *See, e.g., Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983). In such cases, disqualification

preserves the integrity of the adversary system by ensuring that a client will not be disadvantaged by a former attorney's use of information obtained from their confidential relationship. *See Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). Stewart contends that disqualifying Seymour would preclude the misuse of information that defendant disclosed to her attorney in confidence, and thus prevent the Government from obtaining an unfair advantage at trial.

■ Stewart glosses over a key component of the cases that have disqualified lawyers based on the prior representation rule. That prophylactic rule seeks not only to prevent an attorney from using a former client's confidential information to her detriment, but also to preserve the bond of trust and confidence inherent in the attorney-client relationship. It is that relationship, without which "a client would hardly be inclined to discuss his problems freely and in depth with his lawyer, for he would justifiably fear that information he reveals to his lawyer on one day may be used against him on the next," *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir.1973), that drives the concern for the integrity of the adversary system to which Stewart frequently refers. The same concern fuels the staunch protection of the confidentiality of communications between attorney and client, *see Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), and the rule that the attorney-client privilege belongs to the client, not the attorney, *see, e.g., In re von Bulow*, 828 F.2d 94, 100 (2d Cir.1987). Stewart cannot show that the AUSA's inadvertent review of the e-mail has compromised her confidential relationship with her attorney, because Stewart waived her attorney-client privilege over the e-mail when she forwarded it to her daughter. *See Stewart*, at 464–65.

Therefore, the prior representation doctrine does not support Stewart's claim that Seymour should be partially disqualified.

 Stewart also argues that disqualification is appropriate for the same reasons that underlie protection of work product. The work product doctrine creates a "zone of privacy" crucial to a lawyer's preparation of a client's case and to the smooth functioning of the adversary system. *See Stewart*, at 464–65; *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). That zone of privacy, Stewart maintains, has been invaded here, albeit inadvertently. According to Stewart, disqualification is the only remedy that will cure that incursion and properly serve work product policies in this case.

Contrary to Stewart's contention, the work product doctrine does not require such an extreme remedy. Work product does not receive absolute protection, and factual work product, like the e-mail in question, is entitled to less protection than work product that reveals the opinions, theories, or strategies of a lawyer. *See Stewart*, at 466–67; *In re Grand Jury Proceedings*, 219 F.3d 175, 190–91 (2d Cir. 2000). Stewart has cited no decision disqualifying an attorney for inadvertently viewing either kind of work product. The proper remedy in disputes over work product is the remedy already granted here: prohibiting the opposing side from using the document at trial. For example, litigants frequently seek determinations of whether one party has waived work product protection by inadvertently disclosing a document to the opposing side. *See, e.g., United States v. Rigas*, 281 F.Supp.2d 733 (S.D.N.Y.2003). When courts determine that such disclosure does not constitute

waiver, the remedy is always suppression of the document—never disqualification of the opponent who viewed it. That is true of opinion as well as factual work product.

 Disqualification, as the Government points out, is reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior. *See, e.g., United States v. Horn*, 811 F.Supp. 739, 752 (D.N.H.1992) (disqualifying lead prosecutor who repeatedly disobeyed court orders to refrain from reviewing work product impermissibly obtained from defendants); *United States v. Skeddle*, 989 F.Supp. 890, 899 (N.D.Ohio 1997) (holding that prosecutors' access to attorney-client and work product-protected documents did not compel their disqualification, because the search that uncovered the documents was properly executed and "access has not given [the prosecutors] insight ... to the strategies, theories, and tactics of the lawyers representing the defendants").[1] Stewart offers only vague and conclusory allegations of the harm that may arise from Seymour's review of the e-mail. Absent concrete allegations of taint, there is no reason to use disqualification as a remedy for the inadvertent review of factual work product. *Cf. United States v. Chong*, 58 F.Supp.2d 1153, 1160 (D.Haw.1999) (refusing to disqualify prosecutor for inadvertently reviewing a document filed under seal, because he did not engage in misconduct and "did not gain any substantial insight into the relationship between Defendant, his attorneys, and their defense strategies so there could be no prejudice").

---

1. Defendant argues that prosecutorial misconduct cases are inapposite, because disqualification in those situations is levied as a penalty on the prosecution, not a remedy for injury done to the defendant. That is not a particularly meaningful distinction. Whether penalty or remedy, the purpose of disqualification is the same: to preserve the integrity and fairness of the adversary process.

Defendant also appears to suggest, without actually making the argument, that the Government's two-month delay in alerting Stewart to Seymour's inadvertent review of the e-mail was a breach of its ethical obligations and therefore ground for disqualification. But the cases Stewart cites for that proposition are inapposite. For example, *Richards v. Jain*, 168 F.Supp.2d 1195 (W.D.Wash. 2001), involved a paralegal's extensive review of thousands of attorney-client privileged documents belonging to the opposing side. The paralegal's firm did not disclose its possession of the materials for eleven months. *Id.* at 1208. That delay was only one of six factors that the court applied to determine that disqualification was the only remedy that would cure the invasion of the privilege. *Id.* at 1205 (listing, among other relevant factors, the extent of the review, the significance of the privileged information, and the extent of potential prejudice). During the two-month period asserted here, the Government took prompt steps to protect the document and to ascertain whether Stewart would continue to assert privilege over it. Given the Government's reaction and the ambiguities in MSLO's privilege logs, the delay in informing Stewart was not inappropriate. This factual document is not so critical, nor was Seymour's review of it so extensive, that the Government's brief delay in alerting defendant should be considered grounds for Seymour's partial disqualification.

Defendant was not penalized for deficiencies in the privilege logs that MSLO created. *See Stewart,* at 470. Neither should the Government suffer the extreme penalty of partial disqualification for an inadvertent look at a prior statement of the defendant.

### Conclusion

For the foregoing reasons, AUSA Seymour's review of a work product-protected e-mail does not constitute a basis for her disqualification from participating in the cross-examination of defendant Stewart.

SO ORDERED.