UNITED STATES,

v.

**Ronell WILSON, et al., Defendant.**

**No. 04–CR–1016 (NGG).**

United States District Court, E.D. New York.

June 8, 2006.

Colleen Elizabeth Kavanagh, United States Attorney, Eastern District of New York, Brooklyn, NY, Jack Smith, Morris J. Fodeman, U.S. Attorney's Office, Brooklyn, NY, for United States.

Ephraim Savitt, Mitchell J. Dinnerstein, New York City, Kelley J. Sharkey, Attorney at Law, Brooklyn, NY, for Defendant.

### *MEMORANDUM & ORDER*

GARAUFIS, District Judge.

Defendant Ronell Wilson ("Defendant" or "Wilson") is charged in a thirty-count indictment with, *inter alia,* murdering undercover NYPD Detectives Rodney Andrews and James Nemorin on March 10, 2003, and engaging in and conspiring to engage in a pattern of racketeering activity in connection with a street gang known as the "Stapleton Crew." There are seven potential capital counts charged in the indictment, and accordingly, the Government filed a Notice of Intent to Seek the Death Penalty against Wilson on August 2, 2005. Jury selection in the Defendant's death

penalty trial is scheduled to begin on September 11, 2006.

By letter dated January 20, 2005, Wilson filed notice, pursuant to Rule 12.2(b)(2) of the Federal Rules of Criminal Procedure ("Rule 12.2"), that he may introduce, at the penalty phase of his capital case, expert evidence relating to a mental condition bearing on punishment. Currently before the court are several Government motions regarding Rule 12.2 discovery and procedures. For the reasons set forth below, the Government's motions are granted in part and denied in part.

## I. The Statutory Scheme under Fed. R.Crim.P. 12.2

When a criminal defendant has provided notice of intent to introduce evidence of a mental condition at the penalty phase of a capital case pursuant to Rule 12.2(b), as Wilson has, the following provisions are applicable. First, the court "may order the defendant to submit to a competency examination" and "the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court." Rule 12.2(c)(1). Rule 12.2 prohibits disclosure to prosecutors of any "results and reports" of mental examinations conducted by government experts until two things happen: (i) the defendant is found guilty, and (ii) the defendant confirms his intent to rely on mental condition evidence during the penalty phase. Rule 12.2(c)(2). Under Rule 12.2(c)(3), the defendant is not required to disclose the

results and reports of any examinations conducted by defense experts until *after* the government makes the disclosure of its expert results and reports pursuant to Rule 12.2(c)(2). Rule 12.2(c)(3).

The Advisory Committee Notes to Rule 12.2 explain that a primary purpose of the notice provision in 12.2(b) requiring pre-trial notice of mental condition mitigation evidence in the penalty phase is "so that any mental examinations can be conducted without unnecessarily delaying capital sentencing proceedings."[1]

Before addressing the merits of the pending motions, I note some important terminology that will be used throughout this Memorandum & Order. When I use the term "Government," I am referring only to the *prosecution team* in this case, i.e. Assistant United States Attorneys ("AUSA") Colleen Kavanagh and Jack Smith. I will refer to the firewalled AUSA by that name, or as the "taint attorney."

I am also compelled to note at the outset of this opinion the dearth of federal precedent on Rule 12.2 mental condition mitigation evidence issues, particularly post–2002 when Rule 12.2 was amended. Although these issues have not generated a great number of published opinions, the few federal cases on point provide comprehensive and well-reasoned analyses of the issues currently before me. *See United States v. Johnson*, 383 F.Supp.2d 1145 (N.D.Iowa, 2005) (Bennett, Chief J.); *United States v. Fell*, 372 F.Supp.2d 753 (D.Vt.2005); *Unit-*

---

1. Rule 12.2 was amended in 2002. The Notes explain that substantive changes to Rule 12.2 imposed by the 2002 Amendments were designed to address five issues: (1) to clarify that a court may order a mental examination for a defendant who has indicated an intention to raise a defense of mental condition bearing on the issue of guilt; (2) to require the defendant to give notice of an intent to present expert evidence of the defendant's mental condition during a capital sentencing proceeding; (3) to address the ability of the trial court to order mental examination of a defendant who intends to present expert evidence at sentencing and when the results of that examination can be disclosed; (4) to address the timing of disclosure of the reports and results of the defendant's expert examination; and (5) to extend the sanctions for failure to comply with the rule's requirements to the punishment phase of a capital case. Advisory Committee Notes to Fed.R.Crim.P. 12.2 (2002 Amendments).

*ed States v. Johnson,* 362 F.Supp.2d 1043 (N.D.Iowa, 2005), and *United States v. Sampson,* 335 F.Supp.2d 166 (D.Mass. 2004). These cases provide much guidance on deciding the pending motions, and a certain degree of familiarity with these opinions is presumed.

## II. Pending Government Motions Regarding Rule 12.2

### 1. *Government Request for Supplemental Rule 12.2 Notice*

The Government recognizes that it is not entitled to any of the results of examinations conducted by either the defense experts or the Government's experts (under the supervision of the taint attorney) until Wilson is found guilty and confirms his intent to admit evidence of a mental condition in the penalty phase. Nonetheless, the prosecuting attorneys request that the defense immediately turn over to the Government the following mental health related discovery:

(i) the identity of each mental health expert that may be called by the defense

(ii) each expert's area of expertise

(iii) a copy of each expert's curriculum vitae

(iv) all medical records, lay witnesses, third-party documents or reports of interviews or other memoranda (other than those relating to an interview of or examination of the defendant) upon which the defense expert relies or which will be the subject of anticipated expert testimony

(v) a list of citations or copy of any and all research articles or studies on which any expert relied in reaching a

conclusion or opinion the defendant intends to offer on his mental condition at the penalty phase

(*See* Government's Motion Regarding Rule 12.2 Discovery and Procedures ("Govt.Mot."), at 8–9). It is the Government's position that the Defendant is obligated to turn over this discovery to provide "meaningful notice" under Rule 12.2 so that it will be able to prepare its rebuttal case. The Government claims it is "largely in the dark" concerning Wilson's mental condition, which it presumes will be the "central issue in the penalty phase." (Govt. Mot., at 6).

Opinions from two recent death penalty cases shed light on this motion. In *United States v. Sampson,* the government challenged the sufficiency of the defendant's Rule 12.2(b) notice, which, like Wilson's, merely tracked the language of the rule. The government sought an order directing the defendant to: (i) disclose the nature of the mental condition that would be proffered, (ii) disclose the identity and qualifications of all experts, (iii) provide a brief, general summary of topics that experts would cover so that the government could determine areas in which its experts needed to be versed, and (iv) provide all medical records and test results relating to mental health that would be the subject of anticipated expert testimony. *Sampson,* 335 F.Supp.2d at 242. The Massachusetts district court ultimately adopted an agreement reached by the parties in which the defendant would provide to the government only the kinds of mental health experts who would evaluate the defendant (e.g. psychiatrist, neuropsychologist, etc.) and the specific nature of any testing that these experts would perform (e.g. MMPI–2, WAIS–2, etc.).[2] *Id.*

**2.** MMPI–2 refers to the "Minnesota Multiphasic Personality Inventory 2," a widely used written psychological assessment used to diagnose mental disorders. The MMPI is used to screen for personality and psychosocial disorders; it is also frequently administered as part of a neuropsychological test battery to evaluate cognitive functioning. The WAIS–2

The court held that the language in Rule 12.2(c)(3) that provides that the defendant is not required to disclose the "results and reports" of any examinations conducted by defense experts until after the government makes the disclosure of its expert results and reports following a guilty verdict, should be read to mean that the defendant need not turn over in advance of a guilty verdict the nature of the proffered mental condition. The court reasoned that the "nature of the mental illness" is essentially the same as "reports and results" for which early disclosure is barred by Rule 12.2. *Id.* at 243.

Similarly, in *United States v. Johnson,* Judge Bennett of the Northern District of Iowa considered how much information the defendant was required to turn over in order to provide "meaningful notice" under Rule 12.2(b) to the government. Judge Bennett held that the defendant would have to turn over identification of the *kinds of mental health professionals* she selected to evaluate her, and the *nature of the tests* that the defendant's experts had performed or would perform. *Johnson,* 362 F.Supp.2d at 1080. Johnson sought to turn this information over only to the taint attorney team, arguing that the taint attorney—and not the prosecution team—should choose the government's rebuttal experts. The court rejected this argument stating that it "believes that the *prosecuting attorney* should have the opportunity to select the government's rebuttal mental health experts." *Id.* (emphasis in original). Judge Bennett further explained his reasoning in requiring the defendant to turn over to the Government discovery related to the types of tests the defense experts would conduct:

> Because tests like the MMPI–2 or the WAIS–2 are standard diagnostic tools, use of such tests does not disclose to the prosecuting attorneys the specific nature

*of the mental condition that Johnson may assert* in such a way that either her constitutional rights or the scheme contemplated by Rule 12.2 is violated. Therefore, the court will require Johnson to include in her Rule 12.2(b) notice the nature of the tests that her experts have performed or will perform.

*Id.* (emphasis in original).

The *Johnson* court held that the government was not entitled to know the nature of the defendant's mental condition until after disclosure to the defendant of the government's experts' reports and results of testing. On this question, Judge Bennett rejected the government's claims that it would not be able to select appropriate rebuttal experts without knowing the nature of the mental condition for which the defendant was being tested, interviewed or evaluated. He wrote that to adopt the government scheme would be to " 'put the cart before the horse' by reversing the scheme contemplated by Rule 12.2." *Id.* at 1081. Thus, Judge Bennett held that disclosure only of the *kinds of mental health professionals* and the *nature of the tests* that the defendant's experts would perform were required to provide meaningful notice to the government.

■ In the present case, the Government urges this court to extend Judge Bennett's reasoning in *Johnson* to require Wilson to turn over not only the kind of experts he will use and the nature of the tests they will perform, but also the names, areas of expertise and curriculum vitae of the experts, as well as the identities of lay witnesses, and any research articles or studies the experts have relied on in reaching their opinions. I find no support in the Rule or case law for requiring the Defendant to turn over such extensive discovery to the prosecution team at

refers to the "Wechsler Adult Intelligence Scale," and is an IQ test.

this time. Disclosure of the kinds of mental health experts the Defendant will call and the nature of the tests these experts will be performing is sufficient to provide meaningful notice in compliance with Rule 12.2. It is unreasonable to require more.[3]

The Government's motion is therefore denied. The Defendant is directed to inform the Government within two weeks of the date of this Order as to the kinds of mental health experts it anticipates calling at the penalty phase and the nature of the tests those experts have performed or may be expected to perform.

### 2. Government Request for Further Discovery Disclosure to the Firewalled A USA

The Government also moves for an order directing the Defendant to turn over certain discovery relating to Wilson's mental condition to the firewalled AUSA once he or she is appointed. Specifically, the Government asks that the following be immediately turned over to the taint attorney:

(i) summaries of opinions of the defense mental health experts, including the bases and reasons for the opinions;

(ii) the results of tests and reports of examinations administered to Wilson

in the course of reaching the opinions; and

(iii) all raw data obtained by defense experts

(Govt. Mot., at 11). The Government maintains that this disclosure is required pursuant to Fed.R.Crim.P. 16(b)(1)(C)(ii) ("Rule 16"), which provides that "the defendant *must*, at the Government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703 or 705 of the Federal Rules of Evidence as evidence at trial if … the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition." Fed. R.Crim.P. 16(b)(1)(C)(ii) (emphasis added). The Rule further states that "this summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

In response to the Government's requests, defense counsel argues that under the relevant rules and established precedent, required disclosure is limited to *only* the kinds of mental health experts the defense might call at the penalty phase and the nature of the tests performed by defense experts on Wilson, and that this information should be turned over *only* to the firewalled attorney, and not to the

**3.** This is especially true given that the prosecution team is in possession of a great deal of information concerning Wilson's mental condition. Although they claim to be "largely in the dark" about Wilson's mental health background, in 2003, when Wilson was being prosecuted by the State of New York for the murders of Detectives Andrews and Nemorin, defense counsel turned over voluminous discovery in the hopes of convincing the Richmond County District Attorney not to seek the death penalty against Wilson. Approximately 825 pages of medical records were turned over to the Richmond County D.A., which included Wilson's psychiatric records from age 6–15; all medications prescribed for psychiatric treatment during those years; and

records of IQ testing of Wilson. When the case was transferred to federal court, the State turned these documents over to the U.S. Attorney's Office, with the Defendant's consent, and the Government is currently in possession of this discovery. Thus, the defense argues that the Government in fact has a "wealth of information about Mr. Wilson's mental health history," which further mitigates the need to turn over any additional discovery to them at this time. The Government argues that these documents are useless to it as long as they are prohibited from turning them over to their expert. The Government's motion to produce these materials to its expert will discussed separately, *infra.*

Prosecution team. .(Defendant's Memorandum of Law In Response to Government's Rule 12.2 Motion (Filed Under Seal) ("Def.Resp."), at 2). I have already required the limited disclosure of the types of experts hired and the nature of the tests performed must be turned over to the prosecuting attorneys and not just the firewalled AUSA. The remaining question, therefore, is whether there should be additional disclosure to the firewalled AUSA pursuant to Rule 16. The Defendant argues that Rule 16, by its very terms, is inapplicable to the penalty phase of a capital trial, and thus that the rule provides no basis for disclosure to the firewalled attorney that the Government seeks. (*Id.*).

### (a) Applicability of Rule 16(b) to the Penalty Phase Proceeding

The threshold question is whether Rule 16(b) applies to the penalty phase of a death penalty trial. Seemingly, the Rule applies in the penalty phase of a capital case inasmuch as it requires the defendant to provide the government a written summary of any expert testimony that the defendant intends to use at trial if "the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition." Fed.R.Crim.P. 16(b)(1)(C)(ii). Rule 12.2(b), however, has two sub-divisions. It declares that if a defendant intends to introduce expert evidence relating to a mental condition bearing on *either* (1) the issue of guilt *or* (2) the issue of punishment *in a capital case*, the defendant must provide notice to the government of this intention. Fed.R.Crim.P. 12.2 (emphasis added). Based on the either/or dichotomy of Rule 12.2(b), one can reasonably argue that Rule 16(b)(1)(C)(ii) applies only to guilt phase expert evidence. Several arguments support this position. However, as will be discussed below, the court is not persuaded to adopt this reasoning.

The first argument in support of finding Rule 16(b)'s disclosure requirements limited to the guilt phase hinges on the fact that Rule 12.2 was amended in 2002 to include the 12.2(b)(2) provision requiring advance notice of expert mitigation evidence of a mental condition during the penalty phase of a death penalty trial. Although Rule 16 was also amended in 2002, there is no discussion in the Notes to the 2002 Amendment of Rule 16 of its applicability in the death penalty sentencing phase. Thus, arguably, because post–2002 Rule 12.2(b)(2) disclosure is the only explicit defense disclosure obligation concerning the sentencing phase of a capital case, this disclosure circumscribes any other discovery available under Rule 16. In *United States v. Lorenzo–Catalan*, 376 F.Supp.2d 108 (D.Puerto Rico 2005), the only post–2002 case the court has identified addressing the question of the applicability of Rule 16(b)(1)(C)(ii) in the death penalty phase context, the district court of Puerto Rico rejected this argument. There, the court found that it was of "neutral import that unlike Rule 12.2, Rule 16 was never amended for direct application during the penalty phase." *Lorenzo–Catalan–Roman*, 376 F.Supp.2d at 114. The court explained that the Rule 12.2 amendment "simply codified the rationale of the various courts that ordered death-penalty related disclosure of medical experts pursuant to their inherent power," and thus the "the fact of the Rule 12.2 amendment simply proves too much." *Id.* This court joins in the reasoning of the Puerto Rico district court on this issue. That the 2002 Amendments to Rule 16 do not explicitly apply that Rule to the sentencing phase of a capital case does not provide compelling support to find Rule 16's disclosure provision inapplicable here.

A somewhat more persuasive argument is that the text of Rule 16(b)(1)(C)(ii) can only apply in the guilt phase because it

refers to expert evidence the defendant intends to use "under Rules 702, 703, or 705 of the Federal Rules of Evidence at trial." This language suggests applicability only in the guilt phase because the Federal Rules of Evidence do not apply in the sentencing phase of a capital proceeding. *See United States. v. Fell*, 360 F.3d 135, 144 (2d Cir.2004) (in penalty phase of capital case, evidence "that might be excludable under the FRE but is nevertheless both constitutionally permissible and relevant to the determination of whether the death penalty should be imposed in a given case" is admissible). Additionally, use of the phrase *at trial* arguably could refer only to the guilt phase. Though somewhat enticing, the court ultimately finds these arguments unconvincing. First, the penalty phase of a capital case is but the final phase of a single bifurcated (or trifurcated) trial. *See Lorenzo–Catalan–Roman*, 376 F.Supp.2d at 113. Moreover, although the Rules of Evidence are not utilized during the death penalty phase to preclude hearsay and other inadmissible evidence, the mitigation evidence presented concerning Defendant's mental condition will nonetheless comport with the expert evidence requirements of Rules 702, 703, and 705. Thus, the language of Rule 16 is "still reconcilable with penalty phase disclosure" and is certainly not prohibited by the rule. *Id.; see also United States v. Chong*, 58 F.Supp.2d 1153 (D.Hawai'i 1999) (finding no prejudice to the defendant in the inadvertent disclosure of mental condition expert evidence because the Government would have been entitled pursuant to Rule 16(b)(1)(C) to the mental-health discovery relating to the penalty phase that was inadvertently disclosed).

■ Following the lead of the district court in *Lorenzo–Catalan–Roman*, I find that the disclosure provisions of Rule 16(b)(1)(C) should apply to mental condition mitigation evidence in a death penalty trial. As a general rule, the Federal Rules

of Criminal Procedure apply to sentencing hearings. *See* Fed.R.Crim.P. 1 ("These rules govern the procedure in all criminal proceedings in the United States district courts. . . ."). Additionally, subsection (5) of Rule 1 explicitly excludes certain proceedings from the purview of the Federal Rules, but sentencing hearings is not among those excluded. *Id.* 18 U.S.C. § 3593(c), which governs death penalty sentencing proceedings, expressly waives the presentence report requirement of Fed.R.Crim.P. 32(c), which "suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA." *United States v. Webster*, 162 F.3d 308, 346 (5th Cir.1998); *see also Lorenzo–Catalan–Roman*, 376 F.Supp.2d at 113–14.

Finally, the policies which underlie Rule 16 are implicated in the penalty phase context, and thus Rule 16 disclosure ought to be extended in this manner, even if not statutorily required. *See e.g., Lorenzo–Catalan–Roman*, 376 F.Supp.2d at 115 ("Where faced with procedural gaps arising under the FDPA because of its silence regarding disclosure, courts are crafting appropriate procedures pursuant to their inherent powers, importing standards from the Federal Rules of Criminal Procedure.") (citing cases); *United States v. Beckford*, 962 F.Supp. 748, 754–57 (E.D.Va.1997) (pre–2002 amendment to Rule 12.2, ordering penalty phase mental condition evidence disclosure because "the authority to impose notice and reciprocal discovery is an inherent judicial power which need not be grounded in a specific statute or rule"). As the *Lorenzo–Catalan–Roman* court pointed out, "the fair and efficient administration of justice, avoiding surprise and ensuring an informed sentencing determination implement the awesome constitutional protections accorded during capital sentencing

proceedings." *Lorenzo–Catalan–Roman,* 376 F.Supp.2d at 114. The court went on:

> Although the essential policy of facilitating the truth-seeking process is diminished during the sentencing phase because the jury has already rendered its guilty verdict, there nevertheless remain myriad factual issues during the sentencing phase. It is no less imperative that the facts affecting a sentencing determination be as trustworthy as those informing a guilty verdict, and it is beyond dispute that the adequate preparation eased by early disclosure will contribute to the truth-seeking process, resulting in a more reliable sentencing determination.

*Id.* This court agrees that the important goals served by Rule 16(b) disclosure are implicated in the penalty phase and are well-served by applying Rule 16(b) in this context.

Hence, for all of the above-mentioned reasons and pursuant to its inherent power, this court finds that the Defendant is required to disclose *to the firewalled AUSA* a written summary of expert testimony on the defendant's mental condition that the Defendant intends to admit during the penalty phase in accordance with Fed.R.Crim.P. 16(b)(1)(C)(ii). In accordance with the rule, this summary must "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed.R.Crim.P. 16(b)(1)(C)(ii).

In addition to the summaries of expert witness testimony, the Government also seeks an order directing Wilson to turn over to the firewalled AUSA the results of tests and reports of examinations administered to Wilson in the course of reaching the opinions, and all raw data obtained by defense experts. For the same reasons I find the requirements of Rule 16(b)(1)(C)(ii) applicable in the present case, the Defendant is directed to disclose

this information to the firewalled attorney. Use of the firewall protects the Defendant's rights, Rule 12.2 does not prohibit this disclosure, and it will serve the purpose of eliminating unnecessary delay in allowing the Government to adequately prepare its rebuttal case.

### (b) Timing of Rule 16(b) Disclosure

Having determined that disclosure to the firewalled attorney is appropriate, the timing of this disclosure must also be addressed. Rule 16 does not mandate the timing of disclosure, but the Advisory Committee Notes to the 1993 Amendment declare: "Although no specific timing requirements are included, it is expected that the parties will make their requests and disclosures in a *timely fashion.*" Courts in this district typically interpret the "timely fashion" in which expert disclosure should be made to be anywhere from fifteen to thirty days before trial. *See United States v. Lino,* No. 00 CR. 632, 2001 WL 8356, *21 (S.D.N.Y. Dec. 29, 2001) ("Given the scope of the indictment and the number of issues likely to be raised prior to the commencement of trial, this Court directs that the Government provide expert witness disclosure to defendants thirty days before trial."); *United States v. Pirro,* 76 F.Supp.2d 478, 488 (S.D.N.Y.1999) (Government must provide expert disclosure pursuant to Rule 16 no less than fifteen days prior to trial); *United States v. Costen,* No. 95 Cr. 517, 1996 WL 137483, at *2 (S.D.N.Y. Mar. 27, 1996) (expert summaries to be provided in compliance with Rule 16(a)(1)(E) no later than 15 days before trial); *United States v. DeYian,* No. 94 Cr. 719, 1995 WL 368445, *3 (S.D.N.Y. June 21, 1995) (summaries to be provided within 30 days of receipt, and in no event later than two weeks prior to trial).

The Government's motion for immediate Rule 16(b) disclosure is premature; Wilson's trial is not scheduled to begin jury selection for another three months. Nevertheless, although I might direct Rule 16(b) expert discovery to be produced fifteen or thirty days before trial in the typical case, this case, of course, is atypical because it involves the death penalty. As noted above, the trial court has inherent power to fill in procedural gaps not addressed under the FDPA. I am cognizant of the Government's interest in obtaining this information (or rather, having it provided to the firewalled AUSA) as soon as possible so that it can adequately prepare its rebuttal case. I am also cognizant, however, of the Defendant's legitimate interest in not turning any mental health discovery over to the prosecution until he has been found guilty and has confirmed his intent to introduce such evidence at the penalty phase. The court is further concerned with a potential breakdown of the firewall (whether intentional or unintentional), the need to protect the Defendant's constitutional rights, and the desire not to unnecessarily prolong any delay between the guilt and penalty phases of this trial.

With all of these interests in mind, I feel that a compromise is necessary to afford both parties balanced discovery. As was discussed at the status conference held on June 1, 2006, jury selection is scheduled to begin on September 11, 2006 and is expected to last anywhere from one to two months. Thus, the guilt phase of this trial will most likely begin somewhere around the middle of October, at the earliest. The Government anticipates that it will present approximately twenty to twenty-five days of testimony, and thus the guilt phase most likely will conclude no earlier than the end of November. Thus, we can presume that the penalty phase will begin sometime around the end of November or beginning of December, if not later, which is almost six months from now.

The mental health discovery the Government seeks is of no consequence to the prosecuting attorneys until the guilt phase concludes. Until then, it is only the firewalled AUSA who will be concerned with this discovery, and this firewalled attorney will not be involved in any way in the guilt phase of the trial. Of course, to the extent that the firewalled AUSA will coordinate Government testing of the Defendant, Wilson will need to be available for that testing, and this of course is complicated by the fact that he will also need to present at his trial from its beginning. Thus, in an attempt to accommodate the interests of all involved, I hereby order that the Rule 16(b) discovery and additional related discovery, discussed above—namely summaries of expert reports, results of tests and reports of examinations, and all raw data—be disclosed by Wilson to the firewalled AUSA by Monday August 21, 2006. The court expects to issue an opinion on the Defendant's outstanding substantive and death-penalty related pre-trial motions in the coming weeks.[4] Therefore, the Defendant will be given time to consider what types of experts it will hire in light of the court's rulings on the pre-trial motions before disclosing to the firewalled AUSA the expert summaries, reports and results and raw data. The deadline will also give the firewalled attorney sufficient time to utilize the discovery in its preparation of the Government's rebuttal case.

### 3. Government Request for Firewalled AUSA to be an EDNY Criminal Prosecutor

Both sides are in agreement that a firewalled AUSA must be appointed in this case to oversee the Government's mental condition mitigation rebuttal case in the

---

**4.** Argument on these motions will be heard on *June 16, 2006.*

time before the penalty phase begins. Who this taint attorney should be remains in issue. The Government requests that it be allowed to choose its own firewalled attorney, and argues that it is not necessary to appoint a taint attorney from outside the Eastern District of New York ("EDNY") United States Attorney's Office. (*See* Govt. Mot., at 9–10). At the most recent status conference, the Government expressed its concern over ensuring that the firewalled attorney appointed be familiar with death penalty litigation so that he/she can effectively litigate any issues that might arise in connection with the mental condition mitigation evidence. The court is fully aware of the need for a competent firewalled attorney and has no intention of appointing an attorney that is any less. The Defense, in opposition to the Government's request, urges the court to appoint a taint attorney from another district to ensure the integrity of the firewall.

Once again, there is little precedent on this issue. In the *Johnson* case, Judge Bennett noted that two taint teams had already been appointed in that case who worked out of the same office as the prosecuting attorneys, and in both instances the arrangement proved "efficient[ ] and effective[ ]." Thus, he concluded that there was no reason to think there would be a breakdown in the firewall if the taint attorney worked from the same office as the prosecuting attorneys. He nonetheless held that "although not convinced that use of an 'outside taint team' or 'outside taint attorney' is either always necessary or necessary in this case, the court should err on the side of caution by appointing such an 'outsider.' " *Johnson*, 362 F.Supp.2d at 1084. In the *Sampson* case, the court similarly noted that "[a]lthough it is, in theory, possible that a fire-walled AUSA could work in the same office as the prosecutors, in this case *the government* wisely chose to use fire-walled AUSAs from a different district to minimize the possibili-

ty of any inadvertent breach of the firewall." *Sampson*, 335 F.Supp.2d at 245 n. 46 (emphasis added).

■ Consistent with the dicta in these two cases, I find no compelling reason to not take the more cautious route and appoint a firewalled attorney from outside the EDNY. This is especially true given our geographic proximity to several other districts, including the Southern District of New York's U.S. Attorney's Office, located less than two miles away in lower Manhattan, and the District of New Jersey's office. As I have every intention of allowing the Government to find an attorney that is sufficiently experienced in death penalty litigation and who has the time and resources to take on this job, appointing an attorney outside of this district in no way prejudices the Government. Doing so, on the other hand, protects the Defendant's rights as vigorously as possible. Thus, I see no reason to grant the Government's motion. The motion to appoint a criminal prosecutor from the EDNY U.S. Attorney's Office is denied. The Government is directed to submit to the court within two weeks the name and address of a proposed firewalled attorney from another district.

### 4. *Government Request for Court–Ordered Examination of Wilson*

Rule 12.2(c)(1)(b) plainly authorizes the court to order the Defendant to undergo mental examination by Government experts in this case. The question now before the court is one of timing, i.e. whether it is premature to order such an examination now, and if so, when the appropriate time is. The Defendant urges the court to delay ordering mental examination of Wilson until *after* the guilt phase is complete. Additionally, the Defendant reminds the court that a number of issues will need to be decided in advance of ordering Wilson to undergo examination by the Govern-

ment. These issues include, but are not limited to, what procedures will be in place concerning: (i) how much notice should be provided to Wilson in advance of testing; (ii) whether an attorney can be present with Wilson during testing; (iii) limitations on permissible topics on which to question Wilson; (iv) limitations on the types of tests that may be administered; (v) preservation of government experts' notes; and (vi) filing and sealing of reports.

In the death penalty context, courts have consistently authorized mental examination of the defendant by Government experts pre-trial, i.e. before the guilty verdict comes in, in order to avoid delay between the guilt and penalty phases of the trial. *See e.g., Fell,* 372 F.Supp.2d at 761; *Johnson,* 362 F.Supp.2d at 1082; *Sampson,* 335 F.Supp.2d at 242. Obviously, disclosure of the results of this testing is governed by Rule 12.2, and protected through use of the firewalled attorney.

Notwithstanding the trend in federal cases to permit pre-guilty verdict testing of death eligible defendants, Wilson urges the court to follow the reasoning of Judge Weinstein in the case of *United States v. Taveras,* 233 F.R.D. 318 (E.D.N.Y.2006). There, Weinstein espoused that it was unnecessary and unwise to allow early mental examination of defendants in cases where evidence of a mental condition would be offered only in the penalty phase of the trial (in contrast to offering evidence of insanity in the guilt phase, which could negate guilt). *See* 233 F.R.D. at 321 ("This granting of motions for pretrial examination appears to be based on unwarranted comparisons to non-discretionary examination under the Rules pursuant to an insanity defense."). Judge Weinstein expressed concern over the fact that potential "leakage of information from a gov-

ernment expert to the prosecuting attorneys during the course of trial of guilt—or the allegation that this has occurred— might require a hearing and could provide a ground for appeal or a petition for habeas corpus." *Id.* at 322. Thus, he concluded that this risk should be properly avoided by postponing government examination of the defendant until after a guilty verdict is reached. *Id.*

■ Although I recognize the risk that Judge Weinstein sought to avoid in *Taveras,* I am convinced that it is outweighed by the risks associated with delay between the guilt and penalty phases. In *United States v. Beckford,* 962 F.Supp. 748 (E.D.Va.1997),[5] the court aptly described those risks:

To a jury which likely will have been sitting for several weeks on the guilt phase, the prospect of a lengthy delay before sentencing commences is fraught with difficulty. Most troublesome is the fact that evidence for the guilt phase, which usually is adopted at sentencing, will fade from the minds of the jurors; thus, content and context will be harder for the jurors to remember, and the relative roles played by the defendants will be harder for jurors to recall.... The greater the delay between phases, the greater is the need to re-establish, by testimony previously offered, the essential nexus between purely penalty phase evidence and the offenses to which it relates.

Moreover, because the same jury which determines guilt will determine the penalty, delay between guilt and penalty phases increases the risk that a juror will fall ill or pass away or otherwise will become unavailable. Of course, that risk is present even if there

---

5.   Note that the *Beckford* case was decided in 1997, which was before the 2002 amendment to Rule 12.2, which explicitly clarified the court's power to order mental examination in this scenario.

is only a brief delay between the guilt and penalty phases. But, that risk is materially increased by an extensive delay between the proceedings while the Government experts conduct mental examinations of the defendants. And, although the use of alternate jurors is possible, it is quite undesirable at that point in the case.

A related consequence of the delay inherent in deferring the Government's examination until after the guilt phase is the increased difficulty in securing jurors in the first instance. The longer the expected duration of a case, the greater the risk that qualified jurors will be unable to serve. This, of course, works to the prejudice of the defendants, the Government and the judicial system. *Beckford,* 962 F.Supp. at 763. Although Judge Weinstein was not persuaded by the reasoning expressed in Beckford, this court is. *See United States v. Edelin,* 134 F.Supp.2d 45, 57 (D.D.C.2001) (ordering pre-trial mental examination for same reasons expressed by *Beckford* court). Accordingly, the Government's motion for early examination of Wilson is granted.

As noted above, before any such testing can occur, certain procedures will need to be worked out in connection with the testing so that the court and the Defendant are certain that Wilson's Fifth and Sixth Amendment rights are protected. Determining the procedures that will be utilized will be dealt with by the firewalled attorney and not the prosecuting attorneys. Once the firewalled attorney is in place, that person and defense counsel are directed to devise proposed procedures on which both sides can agree. The leading cases that have been cited throughout this M & O provide guidance on workable procedures that protect the interests of all parties. The court should be approached to settle disputes only after the parties have made a good faith effort to resolve them on their own. Once the taint attorney is in place, the court will convene a status conference to discuss these issues further.

### 5. Disclosure of Material Produced to Richmond County District Attorney

The final Government motion concerns more than 800 pages of the Defendant's medical records that the defense team originally turned over to the Richmond County District Attorney in connection with its efforts to convince New York State to not seek the death penalty against Wilson when he was initially prosecuted by the State. Wilson has submitted to the court a letter dated July 1, 2003 from defense attorney Kelley Sharkey to the District Attorney of Richmond County in which Sharkey outlines the contents of these medical records.[6] In the letter accompanying the documents, Sharkey wrote:

> As we discussed at our face to face meeting, we are providing these records for the sole purpose of assisting you in your decision about whether to seek our client's execution. Providing these records in this limited context will not act as a waiver of our client's privileges or rights of privacy or confidentiality.

When Wilson's case was transferred to the U.S. Attorney's Office for federal prosecution, the defense consented to providing the Government with the same documents to assist in the Attorney General's decision on authorization of the death penalty. Thus, the Government has all of these files, and now seeks permission from the

---

**6.** This letter has been filed under seal, and thus the substance of the medical records will not be discussed.

court to turn them over to its experts. (Govt. Mot., at 5 n. 2).

The Government argues that any privileges relating to these materials have "clearly been waived by their production to two different prosecuting offices," but maintains that it is waiting turning them over "in an excess of caution" until the court rules on the issue. (*Id.*). The defense objects to turning these documents over, arguing that they expressly preserved all privileges by turning them over to the State and Federal Government on a conditional basis only. (Def. Resp., at 5, n. 2). The defense further argues that this material would not be disclosed to the Government under Rule 12.2 if sought now in the first instance, and therefore should be considered "firewalled" for Rule 12.2 purposes.

The Defendant's latter argument is convincing. Under Rule 12.2, the Government is not entitled to this material at this time. However, that leaves open the question of whether the material could be turned over to the firewalled AUSA, and in turn to the Government's experts. Both the Government and the Defendant addressed this issue in a mere footnote in their motion papers. Neither party cited any case law in support of its position. Moreover, the Defendant has not articulated the exact nature of the privilege or privileges he believes attach to these documents, nor has he met his burden in showing that a privilege is applicable. *See In re Grand Jury Subpoenas Dated Jan. 20, 1998*, 995 F.Supp. 332, 334 (E.D.N.Y.1998) ("It is the party seeking [the protection of an evidentiary privilege] that bears the burden of establishing the existence of a privilege and its applicability to a particular case.") (citing *United States v. International Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997)).

■ Nevertheless, the court takes this opportunity to address the issue raised. For the reasons expressed below, to the extent that the 825 pages of Wilson's medical records are in fact privileged documents, the court holds that there has been no waiver of that privilege with respect to production to third parties (i.e. the firewalled AUSA or the government experts) by the conditional disclosure to the Richmond County D.A. and to the U.S. Attorney's Office for the Eastern District of New York.[7] The Government's request for permission to turn over the documents, therefore, is denied.

I begin by noting that the court has found no federal precedent dealing with this question, i.e. whether privilege has been waived by the production of (presumably) privileged documents to the government for the purpose of assisting the government in determining whether or not to seek the death penalty against the defendant in a criminal case. The issue, however, is one of selective or conditional waiver, or, put another way, limited disclosure with an express non-waiver agreement. Wilson, through his attorneys, turned over a large number of medical records that, the court assumes *arguendo* for the purposes of this discussion, would otherwise have been privileged, to the government for a limited purpose: to assist in the government's death penalty authorization process. The letter from Wilson's attorney to the Richmond County D.A. reflects and memorializes an express non-waiver agreement; the letter states: "Providing these records in this limited context [i.e. for the sole purpose of assisting you in your decision about whether to seek our client's execution] will not act as a waiver of our client's privileges or rights of privacy or confidentiality." (*See* Def. Resp. Ex. 1, at 2). When the records were forward-

---

**7.** At this time, the court takes no position on whether these materials are in fact privileged.

ed from the State to the U.S. Attorney's Office, the same agreement was plainly in force, as is demonstrated by the fact that the Government now awaits a court order permitting them to release the documents to third parties. (Govt. Mot., at 5 n. 2).

As there appears to be no precedent directly on point, the court looks to other arguably analogous contexts for guidance. In *In re Steinhardt Partners*, 9 F.3d 230 (2d Cir.1993), the Second Circuit considered whether a *civil* defendant had waived its work product privilege when it voluntarily submitted a privileged memorandum to the SEC in a previous investigation.[8] There, the court of appeals upheld waiver of the privilege, but declined to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection. *Id.* at 236. The court explained:

> Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis. Establishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials.

*Id.* (internal citation omitted). Recently, the Southern District interpreted the *Steinhardt* decision in a case where a civil defendant disclosed privileged documents to an adversary but entered into a "confidentiality, 'non-waiver' agreement before producing the documents to the governmental agency." *See In re Natural Gas Commodity Litigation*, 03–Civ–6186, 2005 WL 1457666 (S.D.N.Y. June 21, 2005) (Re-

port and Recommendation of Peck, Chief Mag. J., adopted at 232 F.R.D. 208, 211 (S.D.N.Y.2005)) (hereinafter *"Natural Gas"*). In *Natural Gas*, the court emphasized the fact that the disclosing party and the government agency had an explicit written confidentiality and non-waiver agreement, and noted that "[u]nder *Steinhardt*, that goes a long way to a finding of non-waiver here." *Natural Gas*, 2005 WL 1457666, at \*8.

The *Steinhardt* opinion obviously can be distinguished from the present case on several grounds, most notably it is a civil case and deals exclusively with the work-product privilege. It nonetheless provides guidance in the present case in the absence of any precedent on point. *See United States v. Stewart*, 287 F.Supp.2d 461, 465–66 (S.D.N.Y.2003) (discussing the growth of the work-product doctrine in civil litigation and noting that "[i]t is not obvious, however, that the doctrine should be presumed to have undergone parallel development in criminal and grand jury procedure, although courts, perhaps from a dearth of criminal authority, freely draw from civil cases, and sometimes civil rules, when deciding issues of work product protection in the criminal context").

What I draw from the *Steinhardt* decision is that a question of selective waiver must be decided on a case-by-case basis, and that the existence of an express non-waiver agreement is a critical element of the analysis. Here, Wilson secured a non-waiver agreement before disclosing the contested material. He turned over the material in the hopes of assisting the State, and then the Federal Government, in its decision-making process on whether to seek the death penalty against him.

---

**8.** In *Steinhardt,* the issue was before the Second Circuit on a petition for mandamus filed by the defendant after the district court granted the plaintiff's motion to compel production of the disputed document. Thus, the standard of review utilized was one of "clear abuse of discretion or a usurpation of judicial power." 9 F.3d at 233.

Disclosure for this limited purpose by Wilson cannot be deemed an attempt to use a privilege "in an unfair way that is inconsistent with the principles underlying the doctrine of privilege." *Granite Partners v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 54 (S.D.N.Y.1999). Rather, given the gravity of a potential death sentence, the decision to disclose this material was eminently reasonable, especially in light of the protection Wilson sought to guarantee through the non-waiver agreement.

Therefore, the Court finds that, to the extent that the 800–plus pages of medical records in the possession of the prosecution team are privileged, Wilson has not waived that privilege with respect to further disclosure of the documents to third parties, here the government's expert or firewalled attorney. Wilson selectively waived the privilege for a limited purpose, and secured an express non-waiver agreement that the court will enforce. The Government's request for permission to turn over the documents to its expert or to the firewalled AUSA is denied.

### III. Conclusion

For the reasons set forth above, the court holds as follows:

The Government's motion for supplemental notice pursuant to Rule 12.2(b) is DENIED. The Defendant is directed to inform the Government within two weeks of the date of this Order as to the kinds of mental health experts it anticipates calling at the penalty phase and the nature of the tests those experts have or will perform.

The Government's motion for additional discovery to be provided *to the firewalled AUSA* pursuant to Fed.R.Crim.P. 16(b)(1)(C)(ii) is GRANTED. The Defendant is directed to turn over to the firewalled AUSA a written summary of expert testimony on Defendant's mental condition that he intends to admit during the penalty phase. This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. In addition, the Defendant is directed to turn over to the firewalled AUSA the results of tests and reports of examinations administered to Wilson in the course of reaching his/her expert opinions, and all raw data obtained by defense experts. This disclosure by Wilson to the firewalled AUSA will occur by Monday, August 21, 2006.

The Government's motion to appoint a criminal prosecutor from the EDNY U.S. Attorney's Office is DENIED. The Government is directed to submit to the court and defense counsel within two weeks the name of a proposed firewalled attorney from another district that could be utilized in this case.

The Government's motion for a court order directing Wilson to submit to mental examination in advance of a guilty verdict is GRANTED. Once the firewalled attorney is in place, that person and defense counsel are directed to devise proposed procedures to conduct testing on which both sides can agree. The court should be approached to settle disputes only after the parties have made a good faith effort to resolve them on their own.

Finally, the Government's request for permission to turn over to its expert or to the firewalled AUSA the 825 pages of Wilson's medical records in its possession, to the extent that these material are privileged, is DENIED.

SO ORDERED.